# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-01308-COA

**DARIUS D. JOHNSON A/K/A DARIUS DION JOHNSON A/K/A DARIUS JOHNSON**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:              11/06/2020
TRIAL JUDGE:                  HON. JOHN H. EMFINGER
COURT FROM WHICH APPEALED:    MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                              BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            JOHN K. BRAMLETT JR.
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 10/12/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., WESTBROOKS AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     A defendant was convicted of aggravated assault for shooting his cousin. He now appeals, challenging the jury instructions and the weight of the evidence. Finding no reversible error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     Darius Johnson shot his first cousin Mario in both his legs, his scrotum, his hand, and his back. The shooting occurred in front of the home where their mothers lived, along with Johnson and his children, in Canton.

¶3. The cousins had a history of not getting along and had just run into each other at a nearby gas station. Mario was in town for his sister's funeral. He had stopped for gas on his way to visit his mother, and Johnson was picking up ice.

¶4. According to Mario, he had been moved by the pastor's words earlier that day warning that "[l]ife is too short" to have problems with family. So upon seeing his cousin at the gas station, he "thought it was a sign" and felt inspired to make amends. Mario approached Johnson and asked, "What's up?" At first Johnson laughed and said, "What's up?" to which Mario responded, "No, I ain't talking like that. I'm just asking you what's up." Then Johnson said, "I'll tell you what the f*** up. Get the f*** away from my truck." Mario threw his hand in the air, gesturing at Johnson, and they each got in their cars.

¶5. Mario pulled behind Johnson, intending to leave the gas station. There was no traffic, yet Johnson's Tahoe did not move. Mario drove up beside Johnson, who then flashed a gun at Mario. "[I]n shock," Mario pulled out of the gas station and "took off to the right." He then turned around in the direction of his mother's house. Meanwhile, Johnson had exited the gas station and turned left, driving "really, really, really s[l]ow," also toward the house. Three or four cars separated the cousins. As Mario would later say, he was not concerned Johnson would actually shoot him, so he continued on to his mom's house.

¶6. Johnson arrived at the house first. When Mario pulled up, Johnson had already parked his SUV and was walking toward Mario's truck. Just as Mario started getting out, Johnson "pulled the pistol and he started shooting." Mario, who had no gun, "jumped back" in his truck. Johnson fired several rounds and stopped briefly. Mario lifted his head, and Johnson

2

resumed shooting. Each time Mario raised his head, Johnson continued shooting. Mario got out of the truck and started "running zigzag" toward the house for safety.

¶7. As Johnson continued to shoot at him, Mario, wounded, ran through the yard toward the front door. As he reached the flowerbed in front of the house, Johnson shot him "square up in the back." Mario tried to get in the house, but the front door was locked. At that point, he turned to face Johnson and said, "Man, look . . . [d]on't shoot me no f***ing more. I'm trying to live. I'm trying to go to the hospital."

¶8. Mario then walked around to the garage, leaving a trail of blood behind him. As he went inside the house, he turned around and saw Johnson raise the gun up again. Mario locked the door behind him. Mario's aunt and mother drove him in his truck to the hospital.

¶9. Johnson remembered things differently. He claimed he did not see Mario at the gas station until Mario pulled up next to his truck. Mario "jumped out" of his truck and started hitting on Johnson's window. According to Johnson, Mario said, "I ought'a kill you" to which Johnson responded, "We ain't cousin. We ain't friends. . . . Just get away from my truck." Johnson alleges that Mario was the one who pulled a gun at the gas station just before they left. He recalled that Mario "sped up behind [him]" and followed him to their mothers' house. When they arrived at the house, Mario "jammed the car up and threw it in park" and "jumped out." Scared, Johnson said he "chambered a round and shot." Johnson denies shooting Mario in the back, claiming he stopped shooting when Mario headed toward the house.

¶10. Johnson was indicted for aggravated assault following the shooting. In addition to

3

photographic and video evidence, at trial the jury heard testimony from Mario, Mario's mother, the officer and the sergeant who worked the scene, and the state medical examiner Dr. Mark LeVaughn. Dr. LeVaughn testified about the wounds to Mario's upper chest and back, noting that a bullet entered Mario's back and exited through the chest. As a result of his injuries, Mario is unable to use his right hand and lost strength in his right arm. He can no longer perform the job he did before the shooting.

¶11. Johnson asserted self-defense, and the jury received instructions on the theory. After hearing the testimony and considering the evidence presented, the jury ultimately convicted Johnson of aggravated assault. He now appeals.

## DISCUSSION

¶12. Johnson raises two issues on appeal. First, he contends that the jury was improperly instructed on the theory of self-defense. He also argues that the jury's verdict was against the overwhelming weight of the evidence.

### I. The jury was properly instructed.

¶13. Johnson argues that the trial court failed to properly instruct the jury as to the "imminent danger" element of self-defense, which in turn "eliminated [his theory] from consideration." Specifically, Johnson takes issue with Instruction 5, claiming that it misstated the law, was unnecessary, and conflicted with another instruction.

¶14. It is well established that "jury instructions [are] within the sole discretion of the circuit court." *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012). We therefore review a trial court's decision to grant or deny an instruction using an abuse of discretion standard.

4

*Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). Our Supreme Court has stated that "the instructions actually given must be read as a whole." *Id*. When considered together, the instructions must "fairly announce the law of the case and create no injustice[.]" *Id*. Finally, if "all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law[,]" then no error results. *Id*. at 74 (¶20).

### A. The instructions accurately stated the law.

¶15. We first address Johnson's argument that Instruction 5 misstated the law with regard to "imminent danger." Instruction 5 provided:

> Imminent danger is defined as an immediate threat to one's safety that justifies the use of force in self-defense. Further, immediate is defined as occurring without delay; instant. There must be an overt act at the time of the incident to justify a claim of self-defense.

Johnson claims that this instruction "purports to define" imminent danger but inaccurately states the law by including "the additional problematic component" of an overt act. He argues that "[i]mminent danger can exist without a *per se* overt act."

¶16. This argument fails in light of recent authority from the Mississippi Supreme Court. *See Wells v. State*, 233 So. 3d 279 (Miss. 2017). In *Wells*, the Court quoted Black's Law Dictionary in defining imminent danger as "an immediate threat to one's safety that justifies the use of force in self-defense—The danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself." *Id*. at 285 (¶12). The Court further explained that "immediate" means "occurring without delay; instant." *Id*. Most relevant to Johnson's case, it clarified that "[a]dditionally, our caselaw provides that there must be an overt act *at the time* of the incident to justify a claim of self

5

defense." *Id*. (emphasis in original).

¶17.    Notably, the language from Instruction 5 is taken directly from *Wells*. The record shows that the trial court specifically reviewed and discussed *Wells* in its decision to grant the instruction. Accordingly, we find that granting Instruction 5 based on this precedent was not an abuse of discretion.[1]

¶18.    Johnson argues, as he did at trial, that *Wells* does not apply here because the issue in that case was not the approval of an instruction defining imminent danger, but rather whether the evidence supported a theory of self-defense at all. While it is true that *Wells* did not concern an instruction defining imminent danger, it *did* discuss at length the concept of imminent danger as an element of self-defense. *Id*. More specifically, the *Wells* Court surveyed a century and a half of law in holding that "there must be an overt act *at the time* of the incident to justify a claim of self defense." *Id*. (emphasis in original).

¶19.    The relevant question is whether the instructions, when considered as a whole, accurately stated the law. Instruction 5 used language directly from *Wells*—a recent, binding decision from our state's highest court holding that an overt act is required to prove self-defense. Accordingly, we find that Instruction 5 accurately stated the law.

---

[1] Johnson argues, "The language plucked by the State from the *Wells* opinion does not justify abstractly supplanting that verbiage into a jury instruction." In supporting his argument, he cites caselaw warning "against copying sentences from opinions . . . into instructions." *Freeze v. Taylor*, 257 So. 2d 509, 511 (Miss. 1972). However, the purpose of this rule, as explained in *Freeze* and other cases cited by Johnson, is to avoid the use of legalese that would confuse a jury. "Abstract instructions on legal principles unrelated to facts and issues set out in the instructions are d[an]gerous, because, although such instructions may be correct in principle, they require legal training to properly interpret." *Id*. A trial court's decision to grant an abstract instruction is not reversible error "unless it tends to confuse and mislead the jury." *Id*. That situation is not presented in this case.

6

## B.     Granting Instruction 5 was not an abuse of discretion.

¶20.     In addition to his argument that Instruction 5 misstated the law, Johnson alleges it was unnecessary to define imminent danger because the term was "adequately and accurately covered by Instruction 4," the primary self-defense instruction.[2]  Johnson cites no authority to support his contention; nonetheless, it is without merit.

¶21.     We have long held that the decision "[w]hether to grant or deny proposed jury instructions is within the sole discretion of the circuit court." *Victory*, 83 So. 3d at 373 (¶12). Here, after taking time to review *Wells*, the circuit judge stated, "I believe that a definition of imminent is needed . . ." and subsequently granted Instruction 5.  Given the binding authority of *Wells*, and the wide discretion afforded to the trial court, we find that granting the instruction was not an abuse of discretion.

## C.     Instruction 5 did not conflict with Instruction 4.

¶22.     Finally, Johnson asserts that Instruction 5 was improper because it contradicted Instruction 4.  He argues that unlike Instruction 4, Instruction 5 incorrectly implied that imminent danger must be "actual."

---

[2] Instruction 4 read in pertinent part:

> To make such an act justifiable on the grounds of self-defense, the danger to the defendant must be either: actual, present and urgent, or the defendant must have objectively reasonable grounds, in the opinion of the jury, to apprehend a design on the part of the other person to kill him or do the defendant some great bodily harm.   In addition, the defendant must have objectively reasonable grounds, in the opinion of the jury, to apprehend that there is *imminent danger* of such a design being accomplished.  It is for the jury to determine the reasonableness of the ground upon which the defendant acts.

(Emphasis added).

¶23.   To support his argument, Johnson cites caselaw holding that the danger can be "real or apparent." *See Mitchell v. State*, 90 So. 3d 584, 590 (¶13) (Miss. 2012) (stating that "[a]t one time, common law required the danger to be actual, but now, the danger required must be that which is reasonably apparent and imminent"); *see also McGehee v. State*, 138 Miss. 822, 104 So. 150, 150 (1925) ("While a person has a right to take life when it appears to be necessary to reasonable men, he acts at his peril, because he must have reasonable grounds to believe that what were appearances were in fact realities.").

¶24.   While *Mitchell* and *McGehee* accurately reflect the law, they do not preclude the language in Instruction 5. The jury instructions are communicating different concepts of law. After all, jury instructions should be read as a whole, and "[n]o one instruction should be singled out." *Victory*, 83 So. 3d at 373 (¶12).

¶25.   As Johnson recognizes, Instruction 4 contains the following language: "the danger to the defendant must be either: actual, present and urgent, or the defendant must have objectively reasonable grounds, in the opinion of the jury, to apprehend a design on the part of the other person to kill him or do the defendant some great bodily harm." There was no need to repeat such language in Instruction 5, as the instructions are meant to be read in conjunction with one another. Therefore, the argument that Instructions 4 and 5 conflict is without merit.

¶26.   Given the trial court's careful consideration of Instruction 5, and given the clear authority of *Wells*, it was not an abuse of discretion for the trial court to grant the instruction.

## II.   The verdict was not against the overwhelming weight of the evidence.

¶27. Johnson argues that the jury's guilty verdict was contrary to the overwhelming weight of the evidence and requests a new trial on this ground.

¶28. "When reviewing a challenge to the weight of the evidence, the Court will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Jones v. State*, 154 So. 3d 872, 880 (¶24) (Miss. 2014) (internal quotation marks omitted). We "must accept as true the evidence which supports the verdict." *Herring v. State*, 938 So. 2d 1251, 1253 (¶14) (Miss. Ct. App. 2006).

¶29. Johnson claims that the only evidence supporting the verdict is Mario's testimony at trial. Further, Johnson asserts that Mario's testimony was "so unreasonable and unreliable such that no reasonable juror could have considered it without having reasonable doubt about Mario's truthfulness." However, it is well established that "[a] jury resolves matters of weight and credibility." *Dehart v. State*, 290 So. 3d 373, 376 (¶19) (Miss. Ct. App. 2020).

¶30. Even if Johnson's theory were correct, the jury actually heard from several witnesses at trial who supported the conclusion that Johnson committed aggravated assault. First, Mario gave a step-by-step account of the incident, explaining how his cousin acted hostile toward him at the gas station, flashed a gun at him, and then shot him repeatedly in front of their mothers' home—once in the back as he was running away. The jury also heard from the officer and the sergeant who responded to and investigated the case. The state medical examiner testified regarding some of Mario's multiple, debilitating gunshot wounds. Tellingly, Dr. LeVaughn noted that one bullet entered through Mario's back and exited

9

through his chest.

¶31. The weight and credibility of the testimony was for the jury to determine. The jury considered the testimony, as well as the other evidence presented—including photographs and video evidence—and ultimately voted to convict Johnson. By this decision, the jury also effectively rejected Johnson's theory of self-defense.

¶32. In light of this ample testimony, we cannot say that allowing the guilty verdict to stand would "sanction an unconscionable injustice." We therefore affirm the trial court's denial of Johnson's request for a new trial.

## CONCLUSION

¶33. Because the jury was properly instructed on imminent danger and the verdict was not against the overwhelming weight of the evidence, the judgment is **AFFIRMED**.

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**

10